S. LANE TUCKER
United States Attorney

CHRISTOPHER D. SCHROEDER
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: christopher.schroeder@usdoj.gov

Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MIGUEL PINEIRO JR.,<br><br>Defendant. | No. 3:21-cr-00037-JMK-MMS |

**GOVERNMENT'S POST-HEARING BRIEF**

COMES NOW the United States of America, by and through undersigned counsel, and respectfully submits the Government's Post-Hearing Brief in response to the defendant's Motion to Suppress at Dkt. 144. For the following reasons, the Government respectfully asks the Court to deny the motion in all respects.

//

//

## I. FACTS

### a. The Background of the Investigation.

In the fall of 2020, the DEA was working with a Confidential Source (CS) to investigate a drug dealer named Sarah Butts. Dkt. 216 at 14; *see also* Exh. P-1.[1] Butts told the CS that her source of supply for drugs was a person named "Miguel." *Id.* The DEA encouraged the CS to help identify "Miguel." Dkt. 216 at 15.

The CS provided officers with a cellphone number that the CS said Butts used. The DEA subpoenaed AT&T for subscriber information and toll records for that phone number. In response, AT&T confirmed that Butts was indeed the listed subscriber for that number. *See* Exh. P-1.

The CS also provided officers with a cellphone number for "Miguel". Dkt. 216 at 15. The DEA subpoenaed AT&T for subscriber information and toll records for that number. AT&T confirmed that the subscriber was Miguel Pineiro. Exh. P-1. The toll records received from AT&T also indicated that Pineiro and Butts were in contact 570 times between September 12 and October 4, 2020. *Id.*

At some point, Butts drove the CS to the area of Eastgate Place in Anchorage and told the CS that Pineiro lived nearby. Dkt. 216 at 15.

On October 12, 2020, the CS told investigators that Butts was going to drive from Big Lake to Anchorage to trade Pineiro a blue Ford Mustang in exchange for drugs. Dkt. 216 at 15; *see also* Exh. P-2. The CS stated that a male named "Chris" would be driving

---

[1] Dkt. 216 refers to the transcript of the Hearing on Motion to Suppress held on June 13, 2023.

the blue Mustang, and Butts would be driving her black Ford F-150. Exh. P-2. The DEA, which had a tracking device installed on the black F-150, monitored the vehicle as it drove south down the Parks Highway from Big Lake toward Anchorage. *Id.* They conducted visual surveillance of both the blue Mustang and the black F-150 as they arrived at a bowling alley in Anchorage at 9:30 p.m. Dkt. 216 at 16; *see also* Exh. P-2. At 10:35 p.m., investigators saw a gray Ford Fiesta arrive at the bowling alley and park between the blue Mustang and the black F-150. Exh. P-2. Pineiro got out of the Fiesta and spoke with the male who had arrived in the blue Mustang. *Id.* Pineiro walked around the vehicle as if inspecting it. *Id.* Eventually, he got into the Mustang and drove away. *Id.*

Following Pineiro's acquisition of the blue Mustang, investigators saw the vehicle "numerous other times" parked at Pineiro's residence on Eastgate Place. Dkt. 216 at 16. During the suppression hearing, Special Agent Maria Sutton testified that they saw the blue Mustang parked at Pineiro's residence "all the time[,]" which she estimated to be between 20 and 30 separate instances. *Id.* at 17. Pineiro also drove the blue Mustang to both of the successful controlled buys that the CS completed with him. *Id.* at 216.

### b. The First Buy.

On January 4, 2021, the CS texted Pineiro, "I'm Sara friend from the valley she said that I could hit you up. If not that's cool too. I was seeing if you had anything going on." Exh. P-3 at 1. Pineiro asked "Wat u need" and "Exactly?" *Id.* The CS said, "As much as I can get." *Id.*

After a few days of back and forth, on January 13, 2021, the CS proposed to meet with Pineiro at Humpy's Alehouse in Anchorage between 12:30 and 1:00 p.m. for the

transaction. *Id.* at 6. Pineiro said, "I have my daughter at the moment" but agreed. *Id.* at 7. Special Agent Sutton met with the CS prior to the transaction and searched both the CS and the CS's vehicle, ensuring both were free of any drugs. Dkt. 216 at 20. She provided the CS with an audio recording device and some controlled buy money. *Id.* She and another agent then followed the CS to Humpy's. *Id.* Once they arrived at Humpy's, the CS went inside. *Id.* at 21.

Around the same time, other agents set up surveillance at Pineiro's residence on Eastgate Place. *Id.* They observed Pineiro leave the residence, get into his blue Mustang, and drive to Humpy's. *Id.* at 21-22; *see also* Exh. P-4. At 12:54 p.m., agents observed Pineiro arrive at Humpy's in the blue Mustang with an older woman and a young girl. Exh. P-4. Pineiro approached an undercover agent inside Humpy's, mistakenly believing the agent was the CS. *Id.* Pineiro then sat at a table with the CS while the older woman and the girl sat at a separate table. *Id.*

Special Agent Sutton positively identified the voices of both the CS and Pineiro on the recording as they sat inside Humpy's. *Id.* at 24.[2] At 52:24 in the recording, Pineiro stated, "I have a little bit of dope though."

At approximately 1:44 p.m., Pineiro and the CS walked outside of Humpy's and got into the CS's car, where Pineiro sold the CS a pair of baggies, each containing two ounces of methamphetamine, for $2,000. The audio recording captured the sounds of them getting into the car, followed immediately afterward by the CS saying, "Got two bags… alright.

---

[2] The Court admitted this audio recording as Exhibit 1 during the suppression hearing on June 13, so the Government is not reintroducing it here. If the Court would like a copy of the recording to review, the Government can provide one on request.

You want to just throw 'em in here?" *Id.* at 1:10:30. The CS then asked, "Is there any break on like a pound?" *Id.* at 1:11:02. Pineiro responded, "Nah, shit, yeah, there's a break on a pound." *Id.* at 1:11:09. Pineiro contined: "I could probably do a pound for like 7, 7, 75. Let me do my math… I'll let you know my final number. Just let me do my math." *Id.* at 1:11:26. Pineiro got out of the CS's vehicle and drove away.

Following the buy, Special Agent Sutton followed the CS out of the parking lot another location. Dkt. 216 at 25. The CS provided her with four ounces of methamphetamine purchased from Pineiro for $2,000. *Id.* She confirmed that the drugs purchased were consistent with both what she heard the two discuss on the audio recording and what they had arranged via text message. *Id.*

### c. The Second Buy.

On January 25, the CS texted Pineiro, asking about "blue/green" – coded language referring to fentanyl pills. *See* Exh. P-3 at 12. Pineiro responded, "None for a sec I will keep u posted[.]" *Id.* On January 26, Pineiro texted, "Maybe this week[,]" and "Like how many[?]" *Id.* The CS, again using coded language, said, "At least 250[.]" *Id.*

On January 29, Pineiro texted the CS, "Everything a go ??" *Id.* at 14. The CS confirmed that it was and asked where Pineiro wanted to meet. The two eventually agreed to meet at the Lowe's home improvement store on East Tudor Road in Anchorage. Dkt. 216 at 26; *see also* Exh. P-5.

Special Agent Sutton met with the CS prior to the buy. She provided the CS with an audio recording device and $5,000 of prerecorded buy money. *Id.* She also searched the

*U.S. v. Miguel Pineiro Jr.*
No. 3:21-cr-00037-JMK-MMS          5 of 26
Case 3:21-cr-00037-JMK-MMS   Document 237   Filed 10/13/23   Page 5 of 26

CS and the CS's vehicle for any contraband. *Id.* Finding none, she waited with the CS until the time of the meeting, and then followed the CS to the parking lot of Lowe's.

At 1:07 p.m., agents conducting surveillance at Pineiro's residence on Eastgate Place saw him leave in his blue Mustang. *See* Exh. P-5. They followed him to the parking lot of the Lowe's and watched as he parked next to the CS's vehicle. *Id.* Pineiro got out of the Mustang and into the front passenger seat of the CS's car. *Id.*

Special Agent Sutton again identified the voices of both the CS and Pineiro on the audio recording.[3] Pineiro provided the CS with the previously-agreed upon 250 fentanyl pills. At 11:00 into the recording, the CS could be heard saying, "So these are the different ones though, the good ones. The other ones that were darker, I don't know." Pineiro responded, "Yeah, there's some that are darker, but these are the blueish/green ones… Yeah, these are the good ones." *Id.* at 11:05. The CS stated, "He said that if you get more or whatever, let us know. You know, give us a couple days or whatever, pick those up, and then… Hopefully next week we can get some more clear or something." *Id.* at 11:24. Pineiro responded, "If we can line that up for Monday or Tuesday, like when it comes, that'd be the best. Like, I just got the phone call." *Id.* at 11:43. The CS asked about prices for a pound. Pineiro said, "I could probably do it for like, I probably could do 75. I might could do 7. I don't know, I'm just waiting on him to tell me and what he wants me to do, and we'll go from there…. The faster we can move on those days, that'd be like, immediately, just so we could continue to process, cause the faster we move on the first

---

[3] The Court admitted this audio recording as Exhibit 2 during the suppression hearing on June 13, and the Government can provide the Court with a copy on reques.

days, then we can get more coming. You know what I mean? So, the goal is to get more."
*Id.* at 11:57. They then discussed another of Pineiro's drug customers. Dkt. 216 at 29.

At 2:29 p.m., agents saw Pineiro exit the CS's car, get back into the blue Mustang, and drive away. *Id.* Special Agent Sutton attempted to follow the CS out of the parking lot, but briefly lost sight of them. *Id.* at 45. At 16:59 in the recording, as the CS was driving away from the Lowe's parking lot, the CS answered their phone and spoke to one of the agents (from the recording, it is not clear which agent). CS described their location and asked where the agent wanted them to go. Special Agent Sutton then met with the CS at a neutral location, where the CS provided her with the 250 fentanyl pills purchased from Pineiro. *Id.* at 30. She again confirmed that this was consistent with what the CS arranged to buy from Pineiro that day. *Id.*

### d. The Third Buy.

The DEA then sought to arrange a third controlled purchase of a pound to a pound-and-a-half of methamphetamine from Pineiro. This time, however, they planned to arrest Pineiro en route to the transaction – which would take place somewhere in the Mat-Su Valley – and seize any drugs that he had in his possession. Dkt. 216 at 30-31.

On February 17, 2021, the CS texted Pineiro that they were about to have $9,000 to spend. Exh. P-3 at 21. Pineiro said, "Just let me kno and I'll be ready[,]" followed by "See u ing the morning ??" *Id.* at 22. The CS agreed. The following morning, February 18, Pineiro texted the CS, asking, "What time u headed in today[.]" *Id.* Pineiro mentioned that he had to be in town at 3:00 to pick up his daughter from school, and asked the CS to "[s]end me the address so I know [w]here I'm going[.]" *Id.* The CS texted Pineiro an image

of a marked location at 3500 W. Riverdell Drive in Wasilla. *Id.* at 23. Pineiro responded, "Ok[,]" and "Hitting the highway in 10 minutes[.]" *Id.*

Agents again established surveillance outside Pineiro's residence on Eastgate Place in Anchorage. Dkt. 216 at 32. Special Agent Sutton testified that by this time, they were "confident that was Mr. Pineiro's residence" because "[w]e had observed his vehicle there numerous occasions," including "on the prior two buy dates, as well as other spot checks we conducted. And we had been observing his vehicle there at all times of the day, during the day, at night, for numerous months ahead of time." *Id.*

At 3:24 p.m., agents saw Pineiro leave the residence on Eastgate and get into the passenger seat of a white Toyota Rav-4. Exh. P-6. Agents maintained surveillance on the vehicle as it drove northbound on the Glenn Highway towards the Mat-Su Valley, where Pineiro had arranged to meet with the CS. Exh. P-6; *see also* Dkt. 216 at 33. The DEA, believing that Pineiro would be traveling with drugs to distribute to the CS, requested that Alaska State Troopers initiate a traffic stop of the vehicle. *Id.* Officers detained Pineiro and placed him in the backseat of a patrol car. Pineiro told the agents, "I'm f**ed, you caught me red handed. What I have in the car is going to put me away for a long time." Exh. P-6; *see also* Dkt. 216 at 35.

During the stop, a K9 officer indicated on the odor of controlled substances emanating from the vehicle. *Id.* Pineiro admitted that he put the drugs inside his daughter's backpack, which was in the backseat. Exh. P-6. He also gave consent to search the vehicle, saying, "I'm already f***ed, you're going to get it one way or another. You just told me my whole life story." *Id.* The female driver of the vehicle, identified as Pineiro's girlfriend,

*U.S. v. Miguel Pineiro Jr.*
No. 3:21-cr-00037-JMK-MMS                8 of 26
Case 3:21-cr-00037-JMK-MMS   Document 237   Filed 10/13/23   Page 8 of 26

also consented to a search. *Id.* Inside the vehicle, officers recovered approximately a pound-and-a-half of methamphetamine inside a child's backpack and 33 fentanyl pills in the center console. *Id.* This was the same amount the CS arranged to purchase from Pineiro. Dkt. 216 at 37.

After recovering the drugs from the vehicle, the DEA applied for a search warrant for Pineiro's apartment on Eastgate Place. Special Agent Sutton testified that "based on my training and experience and based on what happened during the previous buys from Mr. Pineiro, we believed that there was going to be additional drug evidence found inside that residence." *Id.* at 38. The affidavit for the warrant explained that agents had "previously observed PINEIRO coming to and from the residence and operating vehicle JDJ954 [identified in the affidavit as the blue Mustang] on numerous surveillance operations." Exh. P-7 at 9. It averred that on the day in question, February 18, agents established surveillance at the residence at "observed PINEIRO's Blue Ford Mustang bearing AK plate JDJ954 parked at the residence." *Id.* From this, the affidavit averred that Pineiro "resides at the TARGET PREMISES[.]" *Id.* The affidavit stated that on the day in question, agents further observed "PINEIRO exit the TARGET PREMISES" and enter another vehicle, which the State Troopers then stopped on the Glenn Highway, searched, and recovered methamphetamine and fentanyl pills. *Id.* at 9-10. The subsequent search of Pineiro's apartment on Eastgate Place revealed 489 grams of methamphetamine, 286 grams of cocaine, three handguns, a stolen AR-15 rifle, a short-barrel shotgun, body armor, and numerous firearm magazines.

//

## II. LAW AND ARGUMENT

### a. The Officers Had Reasonable Suspicion to Stop Pineiro's Vehicle.

An officer has reasonable suspicion to justify an investigatory stop of a vehicle when the officer reasonably suspects that the occupant "has committed or is about to commit a crime." *United States v. Hall*, 974 F.2d 1201, 1204 (9th Cir. 1992) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Reasonable suspicion is a low standard, less than probable cause, and "considerably short of satisfying a preponderance of the evidence standard[.]" *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

In determining whether reasonable suspicion existed to justify a stop, the Court considers the totality of the circumstance. *Sokolow* at 8. Courts afford heavy deference to the officers at the scene, whose "own experience and specialized training to make inferences from and deductions about the cumulative information available to them… 'might well elude an untrained person.'" *Arvizu* at 273 (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996) (reviewing courts must give "due weight" to factual inferences drawn by law enforcement officers)).

It is well-settled that an informant's tip, even an anonymous tip, may be sufficient to establish reasonable suspicion for a stop, depending on its reliability. *United States v. Palos-Marquez*, 591 F.3d 1272, 1275 (9th Cir. 2010). Courts look to several factors to determine the reliability of an informant's tip. "First, a known informant's tip is thought to be more reliable than an anonymous informant's tip." *United States v. Rowland*, 464 F.3d 899, 907 (9th Cir. 2006) (citing *Florida v. J.L.*, 529 U.S. 266, 271 (2000)). Unlike

*U.S. v. Miguel Pineiro Jr.*
No. 3:21-cr-00037-JMK-MMS          10 of 26
Case 3:21-cr-00037-JMK-MMS    Document 237    Filed 10/13/23    Page 10 of 26

anonymous tipsters, known informants can be "questioned about the basis for knowing the information or motive for providing the tip," and risk being "held accountable for providing false information in violation of the law." *Id.* at 908.

"Second, an informant with a proven track record of reliability is considered more reliable than an unproven informant." *Id.* (citing *Adams v. Williams*, 407 U.S. 43, 146-47 (1972)).

"Third, the informant's tip is considered more reliable if the informant reveals the basis of knowledge of the tip—how the informant came to know the information." *Id.* (citing *Spinelli v. United States*, 393 U.S. 410, 416 (1969)).

"Finally, a tip that provides detailed predictive information about future events that is corroborated by police observation may be considered reliable, even if the tip comes from an anonymous source." *Id.* (citing *Alabama v. White*, 496 U.S. 325, 330 (1990)). "Predictive information that reveals a detailed knowledge of an individual's intimate affairs is more reliable than predictive information that could be observed by the general public," and "considerably more valuable if it relates to suspicious activities than if it relates to innocent activities[.]" *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

All four of these factors support the reliability of the CS's information in this case. The CS was a known informant, not an anonymous tipster. The CS had a proven track record of reliability, having completed two successful controlled purchases of drugs from Pineiro. The agents knew the basis of the CS's knowledge from the text messages between Pineiro and the CS in which the two arranged to meet in Wasilla for a drug transaction. And the CS had given accurate predictive information about the October 12, 2020

*U.S. v. Miguel Pineiro Jr.*
No. 3:21-cr-00037-JMK-MMS          11 of 26
Case 3:21-cr-00037-JMK-MMS   Document 237   Filed 10/13/23   Page 11 of 26

transaction in which Sarah Butts traded a blue Mustang to Pineiro, the two prior controlled buys, and the fact that Pineiro would be traveling northbound from Anchorage towards the Mat-Su Valley with drugs in his car on February 18.

The fact that the CS completed two prior, successful controlled buys from Pineiro is particularly weighty in the Court's analysis. *See United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000) (three prior reliable tips leading to arrests and drug seizures were "sufficient to outweigh the doubts about the informant's credibility raised by the history of criminal conduct involving dishonesty."); *United States v. Angulo-Lopez*, 791 F.2d 1394, 1397 (9th Cir. 1986) (an informant may be presumed trustworthy when they have previously provided accurate information, and the inference of trustworthiness is even stronger "[w]hen the information provided in the past involved the same type of criminal activity as the current information") (citations omitted); *United States v. Webster*, 625 F.3d 439, 443-44 (8th Cir. 2010) (finding an informant reliable when the informant had successfully completed two prior controlled buys); *United States v. Lucca*, 377 F.3d 927, 933 (8th Cir. 2004) (explaining that an "informant's track record of reliability [can be] established by successful controlled purchases of crack cocaine").

Equally important is the fact that the agents corroborated much or nearly all the CS's information. The Supreme Court's decisions in this area "have consistently recognized the value of corroboration of details of an informant's tip by independent police work." *Illinois v. Gates*, 462 U.S. at 241. "[I]n making a warrantless arrest an officer 'may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the

*U.S. v. Miguel Pineiro Jr.*
No. 3:21-cr-00037-JMK-MMS            12 of 26
Case 3:21-cr-00037-JMK-MMS   Document 237   Filed 10/13/23   Page 12 of 26

officer's knowledge.'" *Id.* at 242 (quoting *Jones v. United States*, 362 U.S. 257, 269 (1960)).

Here, the agents were able to independently corroborate each of the following pieces of information that the CS provided them in this investigation:

- Sarah Butts's phone number,

- Pineiro's phone number,

- Pineiro was in contact with Butts,

- Pineiro lived at Eastgate Place,

- On October 12, Butts was going to drive from Big Lake to Anchorage in a black Ford F-150, along with another male driving a blue Ford Mustang, and trade the Mustang to Pineiro.

- Pineiro took possession of the blue Mustang on October 12 and thereafter used it as his primary vehicle.

- Pineiro was going to drive to Humpy's at around 12:30 p.m. on January 13, 2021 and meet with the CS for the purpose of selling drugs.

- Pineiro was going to bring his daughter with him to Humpy's.

- Pineiro was audio recorded selling the CS drugs and negotiating prices in the CS's car in the parking lot of Humpy's.

- Pineiro sold the CS two baggies of methamphetamine, and the CS was recorded describing the two bags during the transaction.

- The CS and Pineiro texted about the sale of 250 blue/green pills of fentanyl pills on January 25.

*U.S. v. Miguel Pineiro Jr.*
No. 3:21-cr-00037-JMK-MMS        13 of 26
Case 3:21-cr-00037-JMK-MMS   Document 237   Filed 10/13/23   Page 13 of 26

- The CS and Pineiro agreed to meet at the Lowe's on East Tudor Road on January 29 for the second transaction.

- Pineiro was audio recorded selling what he referred to as "blueish/green" pills to the CS in the second transaction.

- The CS and Pineiro texted about agreeing to meet in Wasilla for the third transaction on February 18 involving a pound to a pound-and-a-half of methamphetamine.

- Pineiro said that he had to pick up his daughter at 3:00 and would then "hit[] the highway."

- Pineiro left Eastgate at 3:24 p.m. and was stopped in a vehicle driving northbound on the Glenn Highway from Anchorage toward Wasilla.

- Pineiro had more than one pound and less than 1.5 pounds of methamphetamine in the vehicle when he was arrested.

- Pineiro admitted to the officers that he put the drugs in his daughter's backpack in the car.

This was not a case involving a single, anonymous tip from an unknown or unreliable source, uncorroborated by any other police investigation. Throughout this entire case, the agents separately corroborated the CS's information through constant visual surveillance, audio recordings, text messages, toll records, subscriber information, and at least one tracker warrant.

Where the defendant's arguments "attack the general credibility of" a CS, such arguments must fail if the CS's credibility is "not based on a general reputation for honesty[,]" but "[r]ather, it was based on independent corroboration of certain key facts[.]"

*U.S. v. Miguel Pineiro Jr.*
No. 3:21-cr-00037-JMK-MMS          14 of 26
Case 3:21-cr-00037-JMK-MMS    Document 237    Filed 10/13/23    Page 14 of 26

*United States v. Burston*, 159 F.3d 1328, 1334 (11th Cir. 1998). Such is the case here. The fact that the agents corroborated numerous pieces of information the CS provided about Pineiro trumps Pineiro's generalized attacks on the CS's credibility and character. "Even if the reliability of a confidential source is not clearly established, the credibility of the statement is 'enhanced' when the statement gives a detailed account of events that is corroborated[.]" *United States v. Alvarez*, 358 F.3d 1194, 1203 (9th Cir. 2004).

> **b. Pineiro's Attacks on the CS's Credibility Improperly Rely Upon Post Hoc Evidence Not Available or Known to the Officers at the Time of the Stop.**

At several points throughout Pineiro's briefing, he attempts to rely upon facts not in existence or known to the officers at the time of the traffic stop on February 18, 2021 to retroactively invalidate the officers' probable cause. For example, Pineiro references each of the following – all of which occurred *after* the search at issue in this case:

- Testimony by the CS's brother in a trial in March 2022. Dkt. 144 at 4.

- Testimony by the CS in a trial in March 2022. *Id.* at 8-11.

- Text messages that defense counsel decoded at trial and confronted the CS with for the first time at trial in March 2022. *Id.* at 10-11.

- An incident involving public intoxication in December 2021. *Id.* at 7.

- Judge Timothy M. Burgess's order granting the defendant's motion for a new trial in *United States v. Matthew Moi*, No. 3:19-cr-00112, in November 2022.

These retrospective attacks on the CS's credibility may be relevant to impeach the CS in the event the CS testifies at trial, but they are not relevant in a probable cause analysis, which is frozen in time at the moment of the search.

*U.S. v. Miguel Pineiro Jr.*
No. 3:21-cr-00037-JMK-MMS          15 of 26
Case 3:21-cr-00037-JMK-MMS   Document 237   Filed 10/13/23   Page 15 of 26

"Whether a Fourth Amendment violation has occurred 'turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time[.]'" *Maryland v. Macon*, 472 U.S. 463, 470 (1985) (quoting *Scott v. United States*, 436 U.S. 128, 136 (1978)). "The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search." *Florida v. J.L.*, 529 U.S. 266, 271 (2000).

In *Moreno v. Baca*, 431 F.3d 633, 639-41 (9th Cir. 2005), the Ninth Circuit held that a court cannot consider facts unknown to the officer at the time of a warrantless search or seizure in determining whether probable cause existed. The plaintiff in *Moreno* alleged in a § 1983 civil rights lawsuit that officers stopped, searched, and arrested him without probable cause. Unbeknownst to the arresting officers at the time, Moreno had both an outstanding arrest warrant and a condition of his parole requiring him to submit to warrantless searches. "[I]n evaluating alleged violations of the Fourth Amendment," however, the Court must conduct "an objective assessment of an officer's actions in light of the facts and circumstances then known to him." *Id.* at 639 (quoting *Scott v. United States*, 436 U.S. at 137). The Ninth Circuit thus held that the officers could not retroactively justify the search and arrest "on the basis of an after-the-fact discovery" of Moreno's arrest warrant or parole condition. *Id.* at 641.

This Court's analysis is therefore confined to the facts known to the officers on February 18, 2021. Just as the police cannot rely upon additional inculpatory evidence that they learned later to justify a stop, neither can a defendant rely upon future impeachment evidence to retroactively invalidate a stop. Subsequently-obtained facts cannot affect

*U.S. v. Miguel Pineiro Jr.*
No. 3:21-cr-00037-JMK-MMS          16 of 26
Case 3:21-cr-00037-JMK-MMS   Document 237   Filed 10/13/23   Page 16 of 26

reasonable suspicion or probable cause. *See United States v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016) ("We emphasize… that although our focus is on the objectively reasonable basis for the stop, not the officers' subjective intentions or beliefs, the facts justifying the stop must be known to the officers at the time of the stop."); *United States v. Doe*, 701 F.2d 819, 821 (9th Cir. 1983) ("We stress that only the facts known to the agents before they turned on their red signal lights may be considered by the court in determining whether founded suspicion existed."); *Rosenbaum v. Washoe County*, 663 F.3d 1071, 1076 (9th Cir. 2011) (holding that the facts relevant to probable cause "are those that were known to the officer at the time of the arrest.").

With Pineiro's extensive digression into future events set to the side, this Court is left with essentially three challenges to the CS's credibility known to the officers at the time of the traffic stop.

*First,* the CS had a criminal record consisting of, according to Pineiro, "two felony convictions for theft and one for Scheme to Defraud." Dkt. 144 at 5. Although this is a fair consideration, courts generally do not treat an informant's criminal history as dispositive or even particularly weighty in their analysis:

> *"*To be sure, factors like an informant's prior criminal record… are to be considered in evaluating his reliability. But such considerations are not dispositive. The fact of the matter is that those who possess information about the inner workings of the drug trade are unlikely to be persons of impeccable moral integrity. While the source's general credibility must be considered, all that the law requires is that, when all the pertinent considerations are weighed, the information reasonably appears to be reliable."

*U.S. v. Miguel Pineiro Jr.*
No. 3:21-cr-00037-JMK-MMS          17 of 26
Case 3:21-cr-00037-JMK-MMS   Document 237   Filed 10/13/23   Page 17 of 26

*United States v. Brown*, 500 F.3d 48, 55 (1st Cir. 2007). *See also United States v. Brown*, 38 F. App'x 449, 451 (9th Cir. 2002). It is also worth noting that, for all the weight Pineiro tries to place on this factor, the CS's most recent conviction is 10 years old. Dkt. 145-4.

*Second*, the CS was involved in drug trafficking. The likelihood that an informant has provided information after their own arrest for selling drugs and to lessen their own criminal exposure "is almost always the case in drug investigations, but it does not make the information they provide inherently unreliable." *United States v. Mitten*, 592 F.3d 767, 774 (7th Cir. 2010). It is also a double-edged sword for Pineiro. The CS's involvement in the drug trade could just as easily be seen as bolstering their credibility as a source of information about others involved in that same trade, and key to establishing their bona fides as a person able to buy large amounts of drugs from other dealers.

*Third*, Pineiro points to police reports regarding three incidents between November 2019 and December 2020 involving the CS. Dkt. 144 at 7. But it is unclear whether or to what extent the CS may have committed wrongdoing in any of those incidents, none of the incidents apparently resulted in criminal charges, and none of them involved crimes of dishonesty.

The Court is thus left with information provided by a known informant, who had proven reliable many times in this very investigation, and whose information the officers had consistently verified at every step along the way. At no point in this case – in either the briefing or the June 13 suppression hearing – has Pineiro identified any information the CS gave regarding this investigation that was false or even that could not be corroborated. The CS's information that Pineiro was going to be traveling northbound towards Wasilla

*U.S. v. Miguel Pineiro Jr.*
No. 3:21-cr-00037-JMK-MMS                    18 of 26
Case 3:21-cr-00037-JMK-MMS   Document 237   Filed 10/13/23   Page 18 of 26

to meet with the CS and sell them drugs, combined with the officers' own observations, was thus more than sufficient to justify the stop of Pineiro's vehicle.

### c. Pineiro Consented to the Search of the Vehicle.

The Government has previously agreed that Pineiro's statements while he was detained in the back of the patrol car would be inadmissible in its case-in-chief at trial because the agents did not *Mirandize* Pineiro before questioning him. Dkt. 130. But a *Miranda* violation does not negate the consent to search. "Statements taken in violation of Miranda may not be used to prove the prosecution's case at trial…. [but] may be used during a motion to suppress to show defendant's consent to a search." *United States v. Lemon*, 550 F.2d 467, 473 (9th Cir. 1977). It may also be used to establish probable cause for a search warrant. *United States v. Patterson*, 812 F.2d 1188, 1193 (9th Cir. 1987).

To invalidate Pineiro's consent to search, Pineiro would have to show that there was no probable cause for the arrest that led to the consent.[4] *See United States v. Taheri*, 648 F.2d 598, 601 (9th Cir. 1981) (evidence found as the result of consent following an invalid arrest must be suppressed unless sufficiently attenuated from the illegal government conduct). Here, the officers had probable cause to arrest Pineiro at the time they stopped his vehicle, based on the CS's information, as well as the officers' own corroboration of the text messages, the K9 officer alerting on Pineiro's vehicle, Pineiro's route of travel, and the two prior controlled buys. Because the arrest itself was valid, Pineiro's consent to search the vehicle was valid as well.[5]

---

[4] It is clear from the record that Pineiro was arrested when the officers handcuffed him and placed him in the back of the patrol car.

*U.S. v. Miguel Pineiro Jr.*
No. 3:21-cr-00037-JMK-MMS          19 of 26
Case 3:21-cr-00037-JMK-MMS   Document 237   Filed 10/13/23   Page 19 of 26

Pineiro's reliance upon case law regarding "prolonged" traffic stops misses the mark. "A seizure justified only by a police-observed traffic violation… 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Rodriguez v. United States*, 575 U.S. 348, 350 (2015) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). The Government is not relying upon a traffic violation as the basis for the stop, so the duration of the stop is irrelevant. "[B]ecause officers also had reasonable suspicion that [the defendant] was engaged in a drug offense, the stop is not limited in duration or scope to an investigation of the observed traffic violation." *United States v. Bradley*, No. 1:20-cr-220-SHR, 2022 WL 16748606, at *3 n. 1 (M.D. Penn. Nov. 7, 2022).

### d. Probable Cause Supported the Search Warrant for Pineiro's Residence.

The Court should likewise reject Pineiro's claim that the magistrate judge erred in issuing the search warrant for Pineiro's apartment. "A magistrate judge may issue a search warrant if, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular location." *United States v. Clark*, 31 F.3d 831, 834 (9th Cir. 1994). The magistrate judge's decision to issue a warrant "is accorded great deference and is reversed only if that determination was clearly erroneous." *United States v. Terry* 911 F.2d 272, 275 (9th Cir. 1990).

The Ninth Circuit "require[s] only a reasonable nexus between the activities supporting probable cause and the locations to be searched." *United States v. Ocampo*, 937 F.2d 485, 490 (9th Cir. 1991). "A 'reasonable nexus' does not require direct evidence that the items listed as the objects of the search are on the premises to be searched[,]" but rather,

*U.S. v. Miguel Pineiro Jr.*
No. 3:21-cr-00037-JMK-MMS          20 of 26
Case 3:21-cr-00037-JMK-MMS   Document 237   Filed 10/13/23   Page 20 of 26

"'that it would be reasonable to seek the evidence in the place indicated in the affidavit.'" *United States v. Pitts*, 6 F.3d 1366, 1369 (9th Cir. 1993) (quoting *United States v. Peacock*, 761 F.2d 1313, 1315 (9th Cir. 1985)).

Here, the affidavit provided the following factual bases from which the magistrate judge could conclude that it would be reasonable to search for evidence of drug trafficking in Pineiro's apartment: (1) Pineiro had just been stopped in a vehicle containing more than a pound of methamphetamine; (2) Pineiro admitted to putting methamphetamine in his daughter's backpack when he saw police stopping the vehicle, (3) immediately prior to the stop, agents observed Pineiro exit the residence and get into the vehicle; (4) the amount of methamphetamine in the car, 477 grams, had a street value of at least $18,000 and was consistent with distribution quantities; (5) agents had previously observed Pineiro coming to and from the residence on numerous occasions; (6) agents had previously observed Pineiro's blue Ford Mustang parked at the residence on numerous occasions; (7) the current occupant of the residence [Shearn Joshua] had a previous homicide charge; (8) there were firearms inside the residence. Exh. 7 at 9-10. In addition, the affidavit averred that based on the agents' training and experience, it was common for drug traffickers to keep evidence of drug trafficking in their residences, including ledgers, safes, U.S. Currency, receipts, cellphones, fraudulent identification documents or cards, scales, baggies, cutting agents, and firearms. *Id.* at 3-8.

These facts were sufficient to provide a "reasonable nexus" between the activities supporting the finding of probable cause and the place to be searched. A magistrate may "draw reasonable inferences about where evidence is likely to be kept, based on the nature

*U.S. v. Miguel Pineiro Jr.*
No. 3:21-cr-00037-JMK-MMS          21 of 26
Case 3:21-cr-00037-JMK-MMS   Document 237   Filed 10/13/23   Page 21 of 26

of the evidence and the type of offense." *United States v. Angulo–Lopez,* 791 F.2d at 1399. The Ninth Circuit has recognized that "'[i]n the case of drug dealers, evidence is likely to be found where the dealers live.'" *United States v. Terry,* 911 F.2d at 275 (quoting *Angulo–Lopez* at 1399). And this is not a case in which officers saw a suspect at a residence once. An officer's repeated "surveillance operations" confirming a suspect's presence in a house or apartment are generally "a sufficient basis for the [magistrate] judge to infer that the defendants lived at the residences searched, and that they were involved in the drug trade." *United States v. Gil*, 58 F.3d 1414, 1418-19 (9th Cir. 1995).

In reviewing a magistrate judge's finding of probable cause, the Supreme Court has emphasized that probable cause depends on "probabilities" and "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Illinois v. Gates*, 462 U.S. at 231. It was more probable than not that evidence of drug trafficking would be found in the residence of a suspect who had just been arrested leaving that residence and stopped on the highway with more than a pound of methamphetamine in the car. The magistrate judge was within his considerable discretion to issue the warrant under these facts.

### e. The Good Faith Exception Would Apply if Necessary.

Given all of this, the Court should never need to reach the question of good faith. But even if this Court were to find the warrant deficient for any reason, the good faith exception to the exclusionary rule would apply to save any evidence from suppression. "The fact that a Fourth Amendment violation occurred – i.e., that a search or arrest was unreasonable – does not necessarily mean that the exclusionary rule applies." *Herring v.*

*U.S. v. Miguel Pineiro Jr.*
No. 3:21-cr-00037-JMK-MMS          22 of 26
Case 3:21-cr-00037-JMK-MMS   Document 237   Filed 10/13/23   Page 22 of 26

*United States*, 555 U.S. 135, 140 (2009). A court will not suppress evidence, even if the search that led to the discovery of that evidence is later deemed invalid, where the officers acted "in objectively reasonable reliance" on a search warrant. *United States v. Leon*, 468 U.S. 897, 922 (1984). The rationale behind *Leon* is that because police officers are not lawyers, and must often make "hurried judgment[s]", courts should not exclude relevant evidence when officers make reasonable mistakes in obtaining a warrant. *Id.* at 914

An officer's decision to apply for a warrant in the first place is prima facie evidence of good faith. *Id.* at 922 ("'a warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.'") (quoting *United States v. Ross*, 456 U.S. 798, 823 n. 32 (1982). "[W]e refuse to rule that an officer is required to disbelieve a judge who has just advised him, by word and by action, that the warrant he possesses authorizes him to conduct the search he has requested." *Massachusetts v. Sheppard*, 468 U.S. 981, 989-90 (1984).

A critical factor in the Court's analysis of good faith is the amount of time the affiant had to draft the affidavit. In determining whether a warrant was obtained reasonably and in good faith, courts should look to "the time pressure under which the Officer was operating when he prepared the warrant application." *United States v. Weber*, 923 F.2d 1338, 1346 (9th Cir. 1990). In *Weber*, the Ninth Circuit declined to apply the good faith exception where "the officers felt little or no time pressure to conduct the search of [the defendant's] residence," and where the officers waited several months to obtain the warrant. *See United States v. Gourde*, 382 F.3d 1003, 1014 (9th Cir. 2004) (discussing

*U.S. v. Miguel Pineiro Jr.*
No. 3:21-cr-00037-JMK-MMS          23 of 26
Case 3:21-cr-00037-JMK-MMS   Document 237   Filed 10/13/23   Page 23 of 26

*Weber* and similarly declining to apply good faith where the officers "waited some four months to apply for the warrant").

Although the record is not clear as to exactly what time the traffic stop occurred, the DEA's report indicates that Pineiro left his residence at 3:24 p.m. Exh. P-6. The magistrate judge signed the warrant at 8:14 p.m. that night. Exh. P-8. The officers thus had only a few hours to prepare and submit the affidavit, rushing to prevent the destruction or loss of evidence inside the apartment. That quick timeframe weighs heavily in favor of a finding of good faith. Moreover, the affidavit notes that there was another person inside the apartment with "previous homicide charges," who had "barricaded" themselves in a previous SWAT operation, and that there were "known firearms currently in the residence." Exh. P-7 at 10. The exigency of these unique circumstances made the situation all the more urgent and time sensitive.

Nor is this the rare and exceptional case involving a "bare bones" affidavit – an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *United States v. Leon*, 468 U.S. at 915, 923. This is an extremely narrow exception, reserved for only the most egregious of cases:

> "[T]he threshold for establishing this exception is a high one, and it should be. As we explained in *Leon*, '[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable cause determination' because '[i]t is the magistrate's responsibility to determine whether the officer's allegations establish probable cause[.]"

*Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012) (quoting *Leon* at 921). "An affidavit is so lacking in indicia of probable cause, or bare bones, when it fails to provide a colorable argument for probable cause." *United States v. Underwood*, 725 F.3d 1076, 1085 (9th Cir.

*U.S. v. Miguel Pineiro Jr.*
No. 3:21-cr-00037-JMK-MMS          24 of 26
Case 3:21-cr-00037-JMK-MMS   Document 237   Filed 10/13/23   Page 24 of 26

2013). "A colorable argument is made when 'thoughtful and competent judges' could disagree that probable cause does not exist." *Id.* (quoting *United States v. Hove*, 848 F.2d 137, 139 (9th Cir. 1988)).

The telltale sign of a barebones affidavit is the near total reliance upon conclusory statements – "[c]onclusions of the affiant unsupported by underlying facts[.]" *Underwood* at 1081. An affidavit cannot merely state "the affiant's or an informer's belief that probable cause exists[,]" but rather, must "detail[]… the underlying circumstances upon which that belief is based." *United States v. Ventresca*, 380 U.S. 102, 109 (1965). "An affidavit must recite underlying facts so that the issuing judge can draw his or her own reasonable inferences and conclusions; it is these facts that form the central basis of the probable cause determination." *Underwood* at 1081.

The affidavit in this case provided the magistrate judge with the facts supporting the decision to issue the warrant. For example, the affidavit averred that Pineiro "resides at the TARGET PREMISES[.]" Exh. P-7 at 9. If the affidavit had stopped there, this would have been a conclusory statement insufficient to establish probable cause. But the affidavit did not stop there. Instead, the affidavit went on to explain that officers had seen Pineiro coming and going from the residence on numerous occasions, and the blue Mustang he was known to drive frequently parked outside. It further averred that on the day of the traffic stop, officers saw Pineiro leave the residence, get into a car, and then head northbound on the Glenn Highway, resulting in the traffic stop. These were not conclusory statements in the sense that *Leon* contemplated. They were, instead, the underlying facts that the affiant used to draw the conclusion that Pineiro lived at Eastgate, and the facts upon which the

*U.S. v. Miguel Pineiro Jr.*
No. 3:21-cr-00037-JMK-MMS          25 of 26
Case 3:21-cr-00037-JMK-MMS   Document 237   Filed 10/13/23   Page 25 of 26

magistrate judge could (and did) draw his own inferences. The affidavit was not "bare bones", and the good faith exception would apply if necessary to save any evidence from suppression.

## III.    CONCLUSION

"Suppression of evidence… has always been our last resort, not our first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). It exacts a "'costly toll' upon truth-seeking and law enforcement" and "presents a high obstacle for those urging [its] application[.]" *Id.* (quoting *Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 364-65 (1998)). Pineiro has failed to surmount that high obstacle necessary to justify preventing a jury from hearing the evidence in this case. For the foregoing reasons, the Government respectfully asks this Honorable Court to deny Pineiro's motion to suppress in all respects.

RESPECTFULLY SUBMITTED October 13, 2023, in Anchorage, Alaska.

S. LANE TUCKER
United States Attorney

*s/ Christopher D. Schroeder*
CHRISTOPHER D. SCHROEDER
Assistant U.S. Attorney
United States of America

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2023,
the foregoing document was served via
the CM/ECF system to the following:

Ben W. Muse, Assistant Federal Defender

*/s/ Christopher D. Schroeder*
Assistant United States Attorney

No. 3:21-cr-00037-JMK-MMS          26 of 26
Case 3:21-cr-00037-JMK-MMS   Document 237   Filed 10/13/23   Page 26 of 26